FILED U.S. DISTRICT COURT
DISTRICT OF UTAH

MAY 12 2026

GARY P. SEDAR
CLERK OF COURT
BY ______
DEPUTY CLERK

MELISSA HOLYOAK, First Assistant United States Attorney (#9832)
MARK Y. HIRATA, Assistant United States Attorney (#5087)
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801) 524-5682

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>RYAN SCOTT ELLSWORTH,<br>EMILEE KELLY, and<br>DRAKE DELL BROADBENT,<br><br>Defendants. | INDICTMENT<br><br>Counts 1-3: 18 U.S.C. § 1347 (Health Care Fraud) (ELLSWORTH)<br><br>Counts 4-6: 18 U.S.C. § 1347 (Health Care Fraud) (KELLY)<br><br>Counts 7-8: 18 U.S.C. § 1347 (Health Care Fraud) (BROADBENT)<br><br>Counts 9-11: 18 U.S.C. § 1343 (Wire Fraud) (ELLSWORTH)<br><br>Counts 12-14: 18 U.S.C. § 1343 (Wire Fraud) (KELLY)<br><br>Counts 15-16: 18 U.S.C. § 1343 (Wire Fraud) (BROADBENT)<br><br>Counts 17-18: 18 U.S.C. § 1035(a)(2) (False Statements Relating to Health Care Matters) (ELLSWORTH & BROADBENT)<br><br>Case: 4:26-cr-00039<br>Assigned To : Allen, Ann Marie McIff<br>Assign. Date : 5/11/2026<br>Description: USA v. |

The Grand Jury charges:

At all times relevant to this Indictment:

## I. THE DEFENDANTS AND RELATED ENTITIES

1. Defendant RYAN SCOTT ELLSWORTH ("ELLSWORTH") was a Utah licensed podiatrist who owned and operated, among other entities, clinics doing business under the name SUMMIT FOOT AND ANKLE (collectively, "SUMMIT"), with clinics located in, among other cities, St. George ("SUMMIT-St. George"), Payson, Provo, Sandy ("SUMMIT-Sandy"), and West Valley City ("SUMMIT-West Valley City"), Utah. SUMMIT's services included, among other things, medical treatment of leg and foot wounds and ulcers. ELLSWORTH also owned and operated AMBLE MEDICAL ("AMBLE") located in Highland, Utah. AMBLE's services included, among other things, medical treatment of leg and foot wounds and ulcers of patients in home health care, hospice care, and residential care facilities.

2. Defendant EMILEE KELLY ("KELLY") was a Utah licensed registered nurse (from 5/13/2016 – 1/31/2025) and an advanced practice registered nurse (3/26/2024 – present) (also known as a "nurse practitioner") who worked primarily out of SUMMIT-St. George. KELLY's services included, among others, medical treatment of leg and foot wounds and ulcers. At times, KELLY provided the foregoing services to patients in home health care, hospice care, and residential care facilities.

3. Defendant DRAKE DELL BROADBENT ("BROADBENT") was a Utah licensed registered nurse who worked primarily out of SUMMIT-St. George and whose services included, among other things, medical treatment of leg and foot wounds and ulcers of in the clinic, home health care, hospice care, and residential care facilities.

## II. THE MEDICARE PROGRAM

4. The Medicare Program ("Medicare") was a federal healthcare program providing health care benefits to individuals who were over the age of 65 or disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

5. Medicare covered different types of benefits, which were separated into different program "parts." Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, nurse practitioners, medical clinics, laboratories, and other qualified health care providers, that were medically necessary and ordered by licensed physicians or other qualified health care providers.

6. Medicare was a "health care benefit program," as defined by 18 U.S.C. § 24(b) and a "Federal health care program," as defined by 42 U.S.C. § 1320a-7b(f).

7. Physicians, nurse practitioners, clinics, and other health care providers were able to apply for and obtain a Medicare "provider number." A healthcare provider that was issued a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries. A Medicare claim was required to set forth, among other things, the beneficiary's name and Medicare identification number, the services that were performed for the beneficiary, the date the services were provided, the cost of the services, and the name and identification number of the physician or other healthcare provider that ordered and/or performed the services. When a claim was submitted, the provider certified, among other things, that:

- The contents of the claim form were true, accurate, and complete; and
- The claim form was prepared in compliance with the laws and regulations governing Medicare.

8. Medicare providers such as ELLSWORTH, KELLY and BROADBENT, were required to comply with all applicable federal and state laws.

9. Copayments set by Medicare were the monetary amounts or percentages paid by beneficiaries for health care services and items received. Medicare required participating providers to collect and make good faith efforts to collect copayments from beneficiaries at the time of billing. Medicare also specified that copayments could not be systematically waived or reduced, in part, because consistent copayment collection was a fraud prevention measure because copayments gave beneficiaries financial incentives to

reject medications and services that were not medically necessary or had little to no value to their treatments.

10. CMS does not pay Medicare claims submitted by Medicare providers directly. Instead, CMS contracts with different Medicare Administrative Contractors ("MACs") to administer the Medicare program through different parts of the United States. In Utah, the MAC with jurisdiction over Medicare Part B claims was Noridian Healthcare Solutions ("Noridian"), based in Fargo, North Dakota.

11. Medicare Part B regulations require physicians, nurse practitioners, and other healthcare providers providing services to Medicare patients to maintain, for at least five years from the last patient encounter, complete and accurate medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting the actual treatment of the patients to whom services were provided and for whom claims for reimbursement were submitted by the attending physician, nurse practitioner, or clinic. The medical records are required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the physician or nurse practitioner under the Part B program.

## III. MEDICARE COVERAGE OF SKIN SUBSTITUTE GRAFTING

12. Medicare providers are required to submit claims only for services that are medically reasonable or necessary. 42 U.S.C. § 1395y(a)(1)(A). Medicare Part B providers also must specifically certify that services are medically necessary. *Id.* at § 424.24(g)(1).

Providers must also ensure that the services they furnish meet professionally recognized standards of care. *Id.* at § 1320c-5(a)(2).

13. Medicare and its MACs promulgated Local Coverage Determinations ("LCDs") and other coverage documents to outline what specific services are deemed covered and non-covered by Medicare in a geographic location.

14. Although there were no controlling LCDs governing Medicare claims for the use of skin substitutes to treat wounds in Utah, LCD L38902 ("Wound and Ulcer Care") applied to wound care in Utah, which included utilization of basic wound care services, consistent with locally acceptable standards of practice and in accordance with accepted standards for medical and surgical treatment of wounds. The extent and number of services provided should be medically necessary and reasonable based on the documented medical evaluation of the patient's condition, diagnosis, and plan.

15. Locally acceptable standards of practice for medical and surgical treatment of wounds included 30 days of basic wound management consisting of debridement, pressure relief, compression, infection control, management of exudate, maintenance of a moist wound environment, and control of comorbid conditions such as, among others, diabetes, vascular disease, and smoking cessation. If after the conclusion of that 30-day period the wound or ulcer has increased in size, remained unchanged, or lacks signs of improvement, advanced wound care can properly be considered, including skin substitute grafting.

16. LCD L38902 also states the patient's medical record should indicate the specific signs/symptoms and other clinical data supporting the wound care provided. It is further expected the physician will document the current status of the wound in the patient's medical record and the patient's response to the current treatment.

17. LCD L38902 further states the patient's medical record also must contain clearly documented evidence of the progress of the wound's response to treatment at each physician visit. This documentation must include, at a minimum:

- Current wound volume (surface dimensions and depth).
- Presence (and extent of) or absence of obvious signs of infection.
- Presence (and extent of) or absence of necrotic, devitalized, or non-viable tissue.
- Other material in the wound that is expected to inhibit healing or promote adjacent tissue breakdown.

18. LCD L38902 further states the medical record must include treatment goals and physician follow-up. The record must document complicating factors for wound healing as well as measures taken to control complicating factors when debridement is part of the plan. Appropriate modification of treatment plans, when necessitated by failure of wounds to heal, must be demonstrated. A wound that shows no improvement after 30 days may require a new approach. Documentation of such cases may include a physician reassessment of underlying infection, metabolic, nutritional, or vascular problems inhibiting wound healing, or a new treatment approach.

## IV. THE SCHEME AND ARTIFICE TO DEFRAUD

19. Beginning around July 2021 and continuing through around December 2025, in the District of Utah and elsewhere,

**RYAN SCOTT ELLSWORTH,**
**EMILEE KELLY, and**
**DRAKE DELL BROADBENT,**

defendants herein, in connection with the delivery of and payment for health care benefits, items, and services, knowingly and willfully executed and attempted to execute, a scheme and artifice to defraud a health care benefit program affecting interstate commerce (to wit: Medicare) and to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by and under the custody and control of Medicare, and aided, abetted, counseled, commanded, induced, and procured the commission of said scheme, and did willfully cause said scheme.

## V. OBJECT OF THE SCHEME AND ARTIFICE TO DEFRAUD

20. It was the object of the scheme and artifice to defraud for the defendants to unlawfully enrich themselves by, among other things, submitting and causing the submission of false and fraudulent claims to Medicare and concealing and causing the concealment of the submission of false and fraudulent claims to Medicare.

## VI. MANNER AND MEANS OF THE SCHEME AND ARTIFICE TO DEFRAUD

21. Defendants sought to accomplish the object of the scheme and artifice to defraud (the "scheme") in the following manner and through the following means, among others:

22. It was part of the scheme that ELLSWORTH, KELLY, and BROADBENT caused the submission of false claims to Medicare for skin substitute services that were medically unnecessary and not rendered as billed, which resulted in fraudulent billings to Medicare.

23. It was further part of the scheme that ELLSWORTH, KELLY, and BROADBENT knew that Medicare billing of a skin substitute was permissible only if basic wound care, as described in paragraphs 14 to 18 above, had been administered to a wound for the previous 30 days. Despite this knowledge, ELLSWORTH, KELLY, and BROADBENT caused the submission of false claims to Medicare for providing skin substitutes to patients who did not have qualifying wounds.

24. It was further part of the scheme that ELLSWORTH, KELLY, and BROADBENT knew that Medicare billing for the continued use of skin substitutes on a wound was permissible only if such treatment was medically necessary. Despite this knowledge, ELLSWORTH, KELLY, and BROADBENT caused the submission of false claims to Medicare for providing the continued and medically unnecessary use of skin substitutes on wounds.

25. It was further part of the scheme that, to facilitate the submission of false claims, ELLSWORTH, KELLY, BROADBENT, and other clinic employees routinely waived and did not pursue Medicare copayments from beneficiaries for skin substitutes which, at times, would have been thousands of dollars owed by a Medicare beneficiary.

26. It was further part of the scheme that ELLSWORTH caused unqualified medical providers and clinic employees including, among others, BROADBENT, to provide skin substitute services that were outside their professional scope of practice. ELLSWORTH further caused the submission of false claims to Medicare for such skin substitutes under his name and Medicare provider number.

27. Between in or around July 2021 and continuing through in or around December 2025, ELLSWORTH caused to be billed over approximately $44 million in claims to Medicare for skin substitutes, many of which were medically unnecessary and, at times, not rendered as billed. Medicare paid SUMMIT over approximately $19 million on these claims. BROADBENT and other unqualified clinic employees also participated in providing some of these skin substitute services.

28. Between in or around 2024 and continuing through in or around December 2025, KELLY caused to be billed over approximately $17 million in claims to Medicare for skin substitutes, many of which were medically unnecessary. Medicare paid SUMMIT over approximately $10 million on these claims.

**Counts 1-3**
**18 U.S.C. §§ 1347 and 2**
**(Health Care Fraud)**

29. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

30. For the purpose of executing the above scheme and artifice to defraud,

**RYAN SCOTT ELLSWORTH,**

defendant herein, aided and abetted and caused the transmission of the following false and fraudulent claims, among others, to Medicare for skin substitute treatments for the beneficiaries identified below:

| Count | Claim Number (Date of Service) | Date of Submission (on or about) | Medicare Amount Billed (Approx.) | Medicare Amount Paid (Approx.) | Patient |
|---|---|---|---|---|---|
| 1 | 372223121015320 (04/26/2023) | 04/29/2023 | $89,006.00 | $67,663.38 | 1 |
| 2 | 372224029009790 (01/24/2024) | 01/27/2024 | $74,449.00 | $58,014.49 | 2 |
| 3 | 372223236018210 (8/18/2023) | 08/24/2023 | $82,034.56 | $32,199.95 | 3 |

All in violation of 18 U.S.C. §§ 1347 and 2.

**Counts 4-6**
**18 U.S.C. §§ 1347 and 2**
**(Health Care Fraud)**

31. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

32. For the purpose of executing the above scheme and artifice to defraud,

**EMILEE KELLY,**

defendant herein, aided and abetted and caused the transmission of the following false and fraudulent claims, among others, to Medicare for skin substitute treatments for the beneficiaries identified below:

| Count | Claim Number | Date of Submission (on or about) | Medicare Amount Billed (Approx.) | Medicare Amount Paid (Approx.) | Patient |
|---|---|---|---|---|---|
| 4 | 372225098152910<br>372225098152920<br>(04/07/2025) | 04/08/2025 | $177,752.56 | $138,599.70 | 1 |
| 5 | 372224212064180<br>(07/26/2024) | 09/13/2024 | $92,532.47 | $72,058.07 | 2 |
| 6 | 372224255014730<br>(7/24/2024) | 09/11/2024 | $99,372.80 | $77,908.18 | 4 |

All in violation of 18 U.S.C. §§ 1347 and 2.

**Counts 7-8**
**18 U.S.C. §§ 1347 and 2**
**(Health Care Fraud)**

33. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

34. For the purpose of executing the above scheme and artifice to defraud,

**DRAKE DELL BROADBENT,**

defendant herein, aided and abetted and caused the transmission of the following false and fraudulent claims, among others, to Medicare for skin substitute treatments for the beneficiaries identified below:

| Count | Claim Number | Date of Submission (on or about) | Medicare Amount Billed (Approx.) | Medicare Amount Paid (Approx.) | Patient |
|---|---|---|---|---|---|
| 7 | 372223053016360<br>372223053016370<br>(02/15/2023) | 02/22/2023 | $108,475.00 | $50,971.48 | 1 |
| 8 | 372223073122610<br>372223073122620<br>(03/08/2023) | 03/14/2023 | $130,075.00 | $50,971.48 | 1 |

All in violation of 18 U.S.C. §§ 1347 and 2.

**Counts 9-11**
**18 U.S.C. §§ 1343 and 2**
**(Wire Fraud)**

35. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

36. Each claim submitted by SUMMIT to Medicare for skin substitute services originated from SUMMIT's corporate office in Sandy, Utah, and was sent through a claims clearinghouse vendor, TriZetto Provider Solutions, in Earth City, Missouri, and on to Noridian in Fargo, North Dakota, for processing and payment.

37. For the purpose of executing the above scheme and artifice to defraud,

**RYAN SCOTT ELLSWORTH,**

defendant herein, aided and abetted and caused the interstate wire transmission of the following false and fraudulent claims, among others, from SUMMIT (Utah) to Medicare / Noridian (North Dakota) for skin substitute treatments for the beneficiaries identified below:

| Count | Claim Number (Date of Service) | Date of Submission (on or about) | Medicare Amount Billed (Approx.) | Medicare Amount Paid (Approx.) | Patient |
|---|---|---|---|---|---|
| 9 | 372223121015320 (04/26/2023) | 04/29/2023 | $89,006.00 | $67,663.38 | 1 |
| 10 | 372224029009790 (01/24/2024) | 01/27/2024 | $74,449.00 | $58,014.49 | 2 |
| 11 | 372223236018210 (8/18/2023) | 08/24/2023 | $82,034.56 | $32,199.95 | 3 |

All in violation of 18 U.S.C. §§ 1343 and 2.

**Counts 12-14**
**18 U.S.C. §§ 1343 and 2**
**(Wire Fraud)**

38. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

39. For the purpose of executing the above scheme and artifice to defraud,

**EMILEE KELLY,**

defendant herein, aided and abetted and caused the interstate wire transmission of the following false and fraudulent claims, among others, from SUMMIT (Utah) to Medicare / Noridian (North Dakota) for skin substitute treatments for the beneficiaries identified below:

| Count | Claim Number (Date of Service) | Date of Submission (on or about) | Medicare Amount Billed (Approx.) | Medicare Amount Paid (Approx.) | Patient |
|---|---|---|---|---|---|
| 12 | 372225098152910<br>372225098152920<br>(04/07/2025) | 04/08/2025 | $177,752.56 | $138,599.70 | 1 |
| 13 | 372224212064180<br>(07/26/2024) | 09/13/2024 | $92,532.47 | $72,058.07 | 2 |
| 14 | 372224255014730<br>(7/24/2024) | 09/11/2024 | $99,372.80 | $77,908.18 | 4 |

All in violation of 18 U.S.C. §§ 1343 and 2.

**Counts 15-16**
**18 U.S.C. §§ 1343 and 2**
**(Wire Fraud)**

40. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

41. For the purpose of executing the above scheme and artifice to defraud,

**DRAKE DELL BROADBENT,**

defendant herein, aided and abetted and caused the interstate wire transmission of the following false and fraudulent claims, among others, from SUMMIT (Utah) to Medicare / Noridian (North Dakota) for skin substitute treatments for the beneficiaries identified below:

| Count | Claim Number (Date of Service) | Date of Submission/ (on or about) | Medicare Amount Billed (Approx.) | Medicare Amount Paid (Approx.) | Patient |
|---|---|---|---|---|---|
| 15 | 372223053016360<br>372223053016370<br>(02/15/2023) | 02/22/2023 | $108,475.00 | $50,971.48 | 1 |
| 16 | 372223073122610<br>372223073122620<br>(03/08/2023) | 03/14/2023 | $130,075.00 | $50,971.48 | 1 |

All in violation of 18 U.S.C. §§ 1343 and 2.

**Counts 17-18**
**18 U.S.C. §§ 1035(a)(2) and 2**
**(False Statements Relating to Health Care Matters)**

42. The allegations set forth above are incorporated herein by reference and realleged as though fully set forth in these counts.

43. On or about each of the dates identified below, in the District of Utah and elsewhere,

**RYAN SCOTT ELLSWORTH and**
**DRAKE DELL BROADBENT,**

defendants herein, knowingly and willfully made materially false, fictitious, and fraudulent statements and representations, and made and used a materially false document knowing the same to contain materially false, fictitious, and fraudulent statements and representations (to wit: patient chart signed by ELLSWORTH falsely reflecting that he had provided skin substitute services and complied with Medicare requirements) in connection with the delivery of and payment for a health care benefit, item, and service involving a

health care benefit program (to wit: Medicare), and aided and abetted each other therein, as described below:

| Count | Document Date (on or about) | Document Description | Patient |
|---|---|---|---|
| 17 | 02/15/2023 | Patient 1 chart signed by ELLSWORTH for date of service on 02/19/2023 | 1 |
| 18 | 03/08/2023 | Patient 1 chart signed by ELLSWORTH for date of service on 03/12/2023 | 1 |

All in violation of 18 U.S.C. §§ 1035(a)(2) and 2.

## NOTICE OF INTENT TO SEEK FORFEITURE

Pursuant to 18 U.S.C. § 982(a)(7), upon conviction of any "Federal health care offense," as defined by 18 U.S.C. § 24(a)(1), including offenses under 18 U.S.C. §§ 1347 and 1035(a)(2), the defendants shall forfeit to the United States of America any property, real or personal, that constitutes or is derived from proceeds traceable to the scheme to defraud.

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), upon conviction of any offense in violation of 18 U.S.C. § 1343, the defendants shall forfeit to the United States of America any property, real or personal, involved in such violations, and any property traceable to such property.

The property to be forfeited in this matter includes, but is not limited to:

- A money judgment equal to the value of any property not available for forfeiture as a result of any act or omission of the defendant(s) for one or more of the reasons listed in 21 U.S.C. § 853(p).

- Substitute property as allowed by 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p).

A TRUE BILL:

/s/

FOREPERSON OF GRAND JURY

MELISSA HOLYOAK
First Assistant United States Attorney

MARK Y. HIRATA
Assistant United States Attorney